941 A.2d 468

**KENT SAND & GRAVEL, LLC**

v.

**JACKSONVILLE MACHINE AND REPAIR, INC.**

**No. 59, Sept. Term, 2007.**

Court of Appeals of Maryland.

Feb. 12, 2008.

Dwight E. Thomey (Baker, Thomey & Emrey, P.A., Elkton), on brief, for petitioner.

Jason L. Allison (Jason L. Allison, P.A., Elkton), on brief, for respondent.

Argued before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, ALAN M. WILNER (retired, specially assigned), and DALE R. CATHELL (retired, specially assigned), JJ.

CATHELL, J.

Petitioner, Kent Sand and Gravel, LLC, presents one issue for our consideration:

> "Whether a mechanics' lien may be obtained against moveable equipment designed to be used at various locations, such as a dredge, pursuant to Title 9 of the Real Property Article of the Maryland Code."

The Circuit Court for Kent County, in effect, answered no. The Court of Special Appeals vacated the trial court's judgment and remanded this case to the Circuit Court for Kent County, holding that the evidence was insufficient for the Court of Special Appeals to determine whether the dredge at issue was subject to a lien, stating:

> "It is possible that a machinery lien might be obtained against the dredge in question, if it is immobile (*i.e.,* remains in a substantially stationary location on the premises during its operational use) and movable (*i.e.,* capable of being removed from the premises and used in another location)."

*Jacksonville Machine and Repair, Inc. v. Kent Sand and Gravel, LLC,* 175 Md.App. 1, 15, 923 A.2d 1023, 1032 (2007). We granted certiorari. *Kent Sand v. Jacksonville Machine,* 401 Md. 172, 931 A.2d 1095 (2007). We agree with the Court of Special Appeals' reasoning in respect to vacating the trial court judgment and remanding the case. Judge Adkins, for that Court, correctly understood the law in this unusual type of mechanics' lien case.[1]

---

1. Part of the confusion stems from the fact that this particular lien statute, considering its early treatment in the courts, appears to have been misplaced in the Real Property Article of the Code during a later recodification when it has relatively little to do with the law of real property and in fact does not provide for a lien on real property (other than wharves and bridges) but a lien on personal property. This may have resulted because of the first two cases construing the early statutes. *Denmead v. The Bank of Baltimore,* 9 Md. 179 (1856); *Wells v. Canton Co., et al.,* 3 Md. 234 (1852). The cases arose out of issues relating to the application of the proceeds of mortgage foreclosure sales. Such sales are quintessentially real property matters. The issues, however, were not traditional real property issues but were cases relating to judicial sales generally. They involved priorities in

The statutory scheme which ultimately resulted in what is now Section 9–102(c) of the Real Property Article (the statutory provision at issue in the present case) began in 1845 with the passage of Chapters 176 and 287 of the Laws of Maryland—1845.[2] The first case in which the 1845 statutes were considered was *Wells v. Canton Co., et al.*, 3 Md. 234 (1852).

respect to the proceeds of judicial sales (which include mortgage or deed of trust foreclosures). They were not contests over the character of real property generally, or over the method in which mortgage foreclosure sales had been held, but battles over what priority the respective claimants would have in respect to the proceeds of the judicial sales as a result of the mechanics' lien statute. The section of the statute at issue in those early cases would not have permitted judicial sales of any real property other than private "wharves" and "bridges" based solely on the particular sections relating to machinery. The specific section of the statute at issue in this case would only have permitted the judicial sale of machinery (which is normally considered personal property,(and wharves and bridges)) albeit the sales would have to be conducted in the same manner as real property sold as a result of mechanics' liens.

By 1957 the lien provisions at issue in this case had found their way into Article 63, "Mechanics' Liens," Section 22 of the Code under the "In General" section. The true real property mechanics' lien sections were in a different subsection under the "In General" heading. There were other headings entitled "Boats and Vessels," "Merchandise," "Garages," "Hospitals," and "Livestock," in that statute. In other words, most, if not all, the statutory provisions for liens, including liens on personal and real property were included in a general lien statute not in a general article relating to real property.

The placement of the provision at issue here stayed in Article 63 in the 1964 Replacement Volume of the Code, the 1968 Replacement Volume, and the 1972 Replacement Volume. In 1975, Article 63 was repealed in its entirety. At the same time the section at issue here relating to machinery, wharves and bridges, and several other sections ended up as part of a codification in the Real Property Article. Many of the other provisions formerly a part of Article 63 ended up in the Commercial Law Article. The seeming illogicality of the application of the current section with its case generated terms "mobile," "immobility," "movable," and "unmovable" results from its placement in the Real Property Article where practitioners (and the writer) tend to have difficulty in applying the terms in a real property context. Practitioners, would not have, necessarily, the same problems applying the terms in a personal property lien context—which, in light of the early cases it properly is.

2. A prior statute passed in 1838 may have been a part of the statutory scheme, but only related to "buildings." The word "machines" found its way into the law via the 1845 statutes.

The case involved the proceeds of the sale via foreclosure of three mortgages covering both the real property and the machines on that property. The construction of some of the machinery, the machinery at issue, had commenced two months before the third mortgage had been recorded and completed a day after the third mortgage was recorded. The persons who had constructed the machinery (appellants in that case—Wells), asserting that they had a right to a portion of the sale proceeds, made a claim for same under the 1845 statutes. The issue was best framed by the Wells as:

> "[T]he act of 1845, ch. 176, sec. 4, first gave the lien on machines and put them on the same footing as houses. The act of 1845, ch. 287, sec. 4, first speaks of judicial sales, the original act of 1838, ch. 205, sec. 8, using the term 'execution.' It is contended on the other side, that the act of 1845, ch. 287, sec. 4, applies only to sales of houses and not machinery, but this is not so—these facts are to be construed in *pari materia,* and machinery is put on the same ground as buildings...."

> "If even the machines had been made fixtures or had been attached to the freehold, the lien under the act which acknowledges machines as subject of liens *distinct from the building,* would be as complete as if they were detached and movable chattels. But they are shown not to be fixtures, and their value has been ascertained by the evidence in the cause...."

> "[T]he act of 1845, ch. 287, sec. 7, makes the lien a preference to mortgages recorded since the *commencement of the building,* so also to every mortgage made after the commencement of the construction of the machinery."

*Wells,* 3 Md. at 236–37.

This Court accepted Wells' argument. We stated:

> "In his report, the auditor refuses to allow this claim [Wells' claim].... In the 4th section of the second act [Chapter 287 of the Laws of 1845] it is declared, 'That every machine hereafter to be erected, constructed or repaired

within the [C]ity of Baltimore,[3] shall be subject to a lien, in like manner as buildings are made subject under the provisions of this and the original act to which this is a supplement.' If, as we have seen, the mechanic's lien has preference over any other encumbrance attaching upon a building subsequent to its commencement, it necessarily follows that the lien of the mechanic attaches as soon as the house is begun. And inasmuch as machines are made subject to liens, 'in like manner as buildings are,' the claim of a mechanic upon a machine must commence as soon as he begins to put up the machine. 'The uncontradicted evidence ... clearly establishing the fact that this machinery was no fixture but movable, and therefore personal property, constituting no part of the factory building....' "

"But admitting the appellants had a lien upon the machinery ..., still it is insisted that they cannot claim payment out of the proceeds of sale, notwithstanding the machinery was included in the sale."

"It cannot be necessary for us to say which is the correct view on this point, because we think upon general principles of equity, a party having a lien upon property, under circumstances like the present, may claim satisfaction out of the proceeds of the same."

*Wells,* 3 Md. at 241–42.

The next case that addresses the subject appears to be the 1856 case of *Denmead v. The Bank of Baltimore,* 9 Md. 179 (1856). There (as dicta), we first stated the types of machinery construction to which the 1845 acts applied, but then held that Denmead was not entitled to payment priority over a mortgagee in a judicial sale context because the mortgage predated the commencement of the construction of the "steam engine, with boilers, tanks, and other usual appurtenances." We opined:

---

3. By 1957, the provision had statewide application.

"It was conceded by the appellants. 1. That the machinery put up by them, as soon as it was attached to the building, became fixtures.

. . .

"[T]he whole case is narrowed down to this: does the claim of the appellants, filed in March 1848, *so far as the machine is concerned,* give to appellants a priority over the appellees who claim under a mortgage executed in 1841?

"It is . . . conceded, that, independently of our legislation [the 1845 legislation], the mortgage held by the appellees would attach *from its date* to any fixtures which might be affixed to the premises covered by it. But, it is insisted, the common law principle is modified by our Acts of Assembly.

. . .

"This section contemplates a lien on machinery arising in three different modes: 1st, where the machine is *erected* in a house or affixed to it or the soil; 2nd, where it is *constructed* and is movable in its operations, such as a locomotive, a threshing machine, and the like; and 3rd, where the machine is *repaired,* whether it be attached to the freehold, or movable in its operation and use.[4]

"In the case now before us the lien arises under that part of the Act which refers to the *erection* of the machine. In *Wells* [ ], this court said, . . . , that *'the claim of the mechanic upon a machine must commence as soon as he begins to put up the machine.'* The evidence . . . shows, that the machine erected by the appellants was not begun to be put up until the year 1848, and under the decision to which we have adverted [the *Wells* case, *supra* ], the lien of the appellants did not commence until that time. . . .

---

4. Whereas the decision of the Court was that the mortgage took priority over the machinist's lien because the mortgage predated the commencement of the machinist's work, this statement as to the three different modes is not a part of the holding of the case, but dicta. Part of the language was later rejected in *New England Car Spring Co., infra.*

"Now it is provided, that the lien acquired on a building for work done or materials furnished 'shall only be preferred to every other lien or encumbrance which attached upon such building, *subsequent* to the commencement of the same.' ... [T]he machinist's claim cannot have a priority over the mortgage of an older date, because that priority is only over liens 'subsequent,' and not to those coeval or simultaneous."

*Denmead*, 9 Md. at 183–84. After reviewing Denmead, the intermediate appellate court, in the present case, went on to discuss some of the procedural issues and the purposes of mechanics' lien statutes, generally, as found in some regular mechanics' lien cases. Those issues are not before this Court because of the narrowness of the certiorari question.[5]

The Court of Special Appeals then discussed the case of *New England Car Spring Co. v. B. & O. R.R. Co.*, 11 Md. 81 (1857). That case involved an attempt to claim a mechanics' lien under the provisions of the 1838 and 1845 statutes above mentioned. In essence, the New England Car Spring Co. (New England) was asserting a materialman's lien against the owners of railroad cars for the value of items it had furnished the manufacturer of the rail road cars. The trial court directed that the jury bring in a verdict for the defendant and the materialman appealed. New England argued:

"The question of the validity of the lien, in this case, depends on the construction to be given to the above laws and the meaning of the word '*machine*,' as used in the 4th sec. of the Act of 1845, ch. 176, whether it embraces the *coal cars* on which this lien was laid. On the construction of these laws we insist:

---

5. The fact that we do not discuss the same matter should not be construed in any manner indicating that we disagree with that Court's general discussion. Judge Adkins, for the intermediate appellate court, furnished an excellent discussion of the various issues. As it relates to the question with which we are faced, we agree with that court's opinion and conclusion if not with its use of the word "retreat." *See* footnote 7, *infra*.

"1st That it is the duty of the court to give them such a construction as will suppress the mischief and advance the remedy. Applying this rule of construction the plaintiffs are found to be within the mischief, for the remedy of which these lien laws were passed, and are, therefore, within the spirit of the Act. No one can believe, that the Legislature, in passing these laws, would designedly exclude the mechanic, who contributed work or materials for coal cars, from the benefit of a lien, while they were giving that privilege to his fellow mechanic, working, perhaps, by his side, under the same roof, on other machines."

*New England Car Sp'g Co.*, 11 Md. at 83. This Court then established that, indeed someone could believe that the Legislature intended that the one mechanic be treated differently than the other. We said at some length:

"It has been argued that the word machine, in this section, being used without qualification, is extensive enough to embrace all kinds of machines, as well those which are movable as those which are fixed or stationary.

"Such a construction would be fraught with the most mischievous consequences. The word machine, if to be taken in its most extended signification, means everything which acts by a combination of the mechanical powers, however simple or complex it may be. . . . [T]his word, if to be understood in its broad general sense, will not only comprehend locomotives, . . . and such like, but . . . machines used in agriculture and commerce, carriages, . . . even watches and clocks, and all the machines in domestic use, would be alike embraced in the terms of the law. . . . Such things, like the coal cars in question, are mere chattels which pass by delivery; a construction which would embrace them within the provisions of the lien laws, would interrupt the daily transactions of trade in such articles, and render the rights of property in them insecure.

[W]e are the more convinced of the propriety of limiting and restraining the meaning of the word *machine,* used in the law to fixed or stationary machinery. . . .

"In this case the mischief to be cured was, that by the common law, the mechanic who erects, constructs or repairs fixed or stationary machinery, like him who builds a house, it without that safe security for compensation which a specific lien on the house or the machine would afford; the design of the Act of 1838, and its supplements, was to afford that security. But with reference to movable machines, the common law affords ample and complete security to the mechanic, by leaving in him the right of property, or in the case of repairs done, giving him a lien thereon, while they remain in his possession, and he has the right to retain the possession and his right of property, or his lien, until his claim for construction or repair is paid.[6] . . . We have not failed to consider the provisions of the Act of 1845, ch. 287, which directs that the lien laws under consideration shall receive a liberal construction, as remedial Acts.

. . .

"These conclusions are at variance with some of the language employed in the opinion of this court, in *Denmead* [ ], *supra,* and while we adhere to the judgment pronounced by the court in that case, we are compelled to say, that a careful consideration of the question before us, has convinced us that the construction of the word *machine* . . . as extending to such as are '*movable in their operation and use, such as a locomotive, a threshing machine, and the like,*' is not justified by sound rules of interpretation.[7]"
*New England Car Sp'g Co.,* 11 Md. at 89–92.

*New England* established that the lien statute at issue there (and here) did not apply to machinery that was inherently

---

**6.** We offered no insight on how a New York Corporation shipping materials from its situs to a factory in Baltimore to be used in manufacturing coal cars, could reasonably retain possession of the material for lien purposes while at the same time delivering them out of its state for use in manufacturing.

**7.** The Court of Special Appeals described this language as a "retreat." Like the Marines, this Court does not retreat; on occasion we do advance in a different direction.

always movable without the necessity of disassembly and reassembly. From pointing out when a machine was too movable to be subject to a mechanics' lien under this statute, the Court of Special Appeals then turned to another of our old cases, *Stebbins v. Culbreth,* 86 Md. 656, 39 A. 321 (1898), to illustrate when machinery was fixed too permanently to real property to be subject to a lien under the statute. As the Court of Special Appeals noted, then quoted from *Stebbins:*

> "[T]he Court of Appeals held that a machinery lien could not be claimed on a hotel steam-heating apparatus, consisting of a boiler and furnace, built in brick and cement, with pipes and radiators extending throughout the building, because
>
>> '[t]his structure is part of the building, and is in the nature of a permanent fixture, and necessary for the comfortable, convenient, and customary use of the building as a hotel. If removed, it would not only impair the use of the hotel, but would practically destroy the purposes for which the building was used. The legislature could never have intended to give a lien upon such a structure....' "

*Jacksonville Machine and Repair, Inc.,* 175 Md.App. at 7, 923 A.2d at 1027 (citing *Stebbins,* 86 Md. at 657, 39 A. at 322).

After its discussion of the sparse case treatment on the statute and interpreting the "advances in a different direction" of this Court, Judge Adkins for the Court of Special Appeals formulated how the statute at issue is intended to be applied. She stated:

> "Thus, the coal cars at issue in *New England Car Spring* were not lienable under the mechanic's lien statute due to their mobility.
>
> "In contrast, an immobile machine may be either movable or unmovable.[8] When such a machine becomes a fixture,

---

8. The term "mobility," i.e., mobile, as it was used in that Court's opinion means that it is movable on its own power or external power without any substantial disassembly. The phrase "an immobile ma-

as in the case of a heating system incorporated into a building, mechanic's lien rights must be asserted against the building itself. But when 'the mechanic ... erects, constructs or repairs fixed or stationary machinery' that is not incorporated into a building or land as a fixture, it often needs the protection of a machinery lien as 'safe security for compensation.' These immobile but movable machines are subject to the statutory lien created by RP section 9–102(c)." (Citations omitted.)

*Jacksonville Machine,* 175 Md.App. at 11, 923 A.2d at 1029. We agree with the Court of Special Appeals.

We also agree with the Court of Special Appeals' remand to the trial court for it to establish the character of the specific dredge in question as to its mobility, movability, or immovability. As the intermediate appellate court opined:

"Kent Sand and Gravel argued that the dredge is just another mobile machine, such as a 'railroad car, or a truck,' because 'rather than moving ... on a highway or a rail line,' it 'moves in water.'..."

"Jacksonville Machine disputed that the dredge is mobile, arguing that it is not designed to 'float about on a river or waterway.' To the contrary, it 'was installed and built in an enclosed gravel pit[,]' for the specific purpose of digging at that site for 'ten to fifteen years,' so that it materially differs from a river dredge or coal car that moves 'here and there.' ... [T]his dredge is neither 'movable in operational use' nor easily 'removable as security' in the manner contemplated in *New England Car Spring Co ....*"

"At the conclusion of the hearing, the [trial] court viewed 'this [as] an academic exercise[,]' ruling as a matter of law that Jacksonville Machine could not obtain a mechanic's lien because

**'this dredge is ... movable.... The machinery that they talk about [in the cases] is fixed to the land....**

---

chine may be either movable or unmovable" refers to whether it can be moved, not whether it is mobile in operation.

**[W]hile it is movable, it isn't going anywhere**.... **I think it's just a little short of being where the statute requires it** to be....' "

"We question this rationale because the court appears to have mixed the apples of 'mobility during operational use' with the oranges of 'removability from the premises.'..."

"[I]f the dredge is mobile, it cannot be subjected to a machinery lien [under this statute], but if the dredge is immobile, and it is otherwise removable, then it might be a lienable machine. We conclude that the court did no t adequately consider how the dredge performs its work or how it is installed in the quarry, which are critical in determining whether it is mobile in its operational use."

. . .

"It is possible that a machinery lien might be obtained against the dredge in question, if it is immobile (*i.e.,* remains in a substantially stationary location on the premises during its operational use) and movable (*i.e.,* capable of being removed from the premises and used in another location)."

*Jacksonville Machine,* 175 Md.App. at 12–15, 923 A.2d at 1030–32. We believe that the decision of the Court of Special Appeals was correct and shall affirm its decision.

We choose to point out only one other practical matter in order to reduce the possibility of confusion in future lien cases involving dredges. That is that there are different types of dredges. There are hopper dredges which are actually boats similar to that now dredging offshore of Ocean City that sail on a daily basis from the harbor and dredge sand from an off-shore sand bar and then motor near the shore of Assateague and drop sand in the near shore area through hatches that open in the bottom of the vessel so that nature can complete the sand replenishment in order to slow down the westward migration of the island. There are hydraulic dredges that dredge sand from off-shore sand deposits (or other open water areas containing suitable fill) and pipe it hydraulically to beaches for replenishment purposes or to private property for

fill purposes. There are dredges of several different kinds that are mounted on barges that are either self propelled or regularly moved by tugboats to different locations without the necessity of disassembly and are used to maintain channels and deposit fill. The difference in these types of dredge operations is that the other dredges, unlike the dredge at issue here, are designed to be moved from one site to another merely by self-power, or other vessel power, without substantial disassembly. Our opinion, and the Court of Special Appeals' opinion, should not be construed as necessarily applying to these alternate, or other alternate, types of dredges.

The judgment of the Court of Special Appeals is affirmed.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**